**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

_____
                                                                )
VALERO ENERGY CORPORATION          )
                                                                )
        Plaintiff,                                       )
                                                                )
v.                                                            )        Case No. 7:17-CV-00004-O
                                                                )
U.S. ENVIRONMENTAL PROTECTION    )
AGENCY, *et al*.,                                  )
                                                                )
        Defendants.                                 )
_____)

**APPENDIX TO MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

EXHIBIT A.        Petition for Review (February 12, 2016) ..........................................................1

EXHIBIT B.        Obligated Party Petitioners' Opening Brief Regarding
                        EPA's Refusal to Consider the Appropriate Placement
                        of the Compliance Obligation in the Final Rule (September 8, 2016) ..............6

EXHIBIT C.        Order, D.C. Cir. No. 16-1005 (January 30, 2017)...........................................59

EXHIBIT D.        Petition for Review on "After-Arising" Grounds with Attached
                        Administrative Petition (February 12, 2016) ..................................................60

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   FEB 12 2016

FEB 12 2016

CLERK

RECEIVED

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

VALERO ENERGY CORPORATION, )
                               )
      **Petitioner,**       )
                                 )
    v.                             )
                                 )
UNITED STATES ENVIRONMENTAL )
PROTECTION AGENCY,            )
                                 )
      **Respondent.**        )
—————————————————— )

**Case No. 16-1054**

## PETITION FOR REVIEW

Pursuant to Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), Section 702 of the Administrative Procedure Act, 5 U.S.C. § 702, Rule 15(a) of the Federal Rule of Appellate Procedure, and the U.S. Constitution, Valero Energy Corporation hereby petitions this Court to review the final action of the Administrator of the United States Environmental Protection Agency in promulgating a final rule entitled "Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017," published in the Federal Register at 80 Fed. Reg. 77,420 (Dec. 14, 2015).

1

Respectfully submitted,

Date: February 12, 2015

Lisa M. Jaeger

Lisa M. Jaeger
Richard Alonso
Sandra Y. Snyder
Bracewell LLP
2000 K Street, NW
Suite 500
Washington, DC 20006-1872
202.828.5800 telephone
202.857.4812 facsimile
Lisa.jaeger@bracewelllaw.com
Richard.Alonso@bracewelllaw.com
Sandra.snyder@bracewelllaw.com

Clara Poffenberger
Clara Poffenberger Environmental Law and
    Policy LLC
2933 Fairhill Road
Fairfax, VA 22031
703.231.5251 telephone
Clara@airandclimatelaw.com

*Counsel for Petitioner*
*Valero Energy Corporation*

2

## CERTIFICATE OF SERVICE

Pursuant to Rule 15(c) of the Federal Rules of Appellate Procedure, I hereby

certify that I have this day caused the foregoing "Petition for Review" and "Corporate

Disclosure Statement" to be served, by first-class mail, postage prepaid, upon the

following:

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
Room 3000, William Jefferson Clinton Building
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

John Cruden, Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
RFK DOJ Building, Room 2143
950 Pennsylvania Ave., NW
Washington, D.C. 20530

Date: February 12, 2015

Lisa M. Jaeger

-3-

3

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 12 2016

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 12 2016

CLERK

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**VALERO ENERGY CORPORATION,**                )
                                                                      )
                                                                      )
                                                                      )
                                                                      )
                                                                      )
            **Petitioners,**                             )            Case No. **16-1054**
                                                                      )
    **v.**                                                       )
                                                                      )
**UNITED STATES ENVIRONMENTAL** )
**PROTECTION AGENCY,**                        )
                                                                      )
            **Respondent.**                            )
                                                                      )

## CORPORATE DISCLOSURE STATEMENT

1.  Valero Energy Corporation ("Valero") submits the following corporate

    disclosure statement pursuant to Rule 26.1 of the Federal Rules of Appellate

    Procedure.

2.  Valero is a Texas-based energy company incorporated under the laws of

    Delaware. Valero refines transportation fuels, owns multiple ethanol plants,

    and markets these fuels throughout the U.S. Valero has no parent corporation

    and no publicly held company owns a 10 percent or greater interest of its stock.

4

Respectfully submitted,

Date: February 12, 2015

Lisa M. Jaeger /svp

Lisa M. Jaeger
Richard Alonso
Sandra Y. Snyder
Bracewell LLP
2000 K Street, NW
Suite 500
Washington, DC 20006-1872
202.828.5800 telephone
202.857.4812 facsimile
Lisa.jaeger@bracewelllaw.com
Richard.Alonso@bracewelllaw.com
Sandra.snyder@bracewelllaw.com

Clara Poffenberger
Clara Poffenberger Environmental Law and
    Policy LLC
2933 Fairhill Road
Fairfax, VA 22031
703.231.5251 telephone
Clara@airandclimatelaw.com

*Counsel for Petitioner*
*Valero Energy Corporation*

-5-

5

## ORAL ARGUMENT NOT SCHEDULED

## No. 16-1005 (and consolidated cases)

### IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Americans for Clean Energy, et al.,
Petitioners

v.

Environmental Protection Agency,
Respondent

Petition for Review of Final Agency Action
of the Environmental Protection Agency

### Obligated Party Petitioners' Opening Brief Regarding EPA's Refusal to Consider the Appropriate Placement of the Compliance Obligation in the Final Rule

Samara L. Kline
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201
(214) 953-6500

Evan A. Young
BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Suite 1500
Austin, TX 78701
(512) 322-2506

Shane Pennington
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
(713) 229-1340

Lisa M. Jaeger
Richard Alonso
BRACEWELL LLP
2000 K Street, NW
Suite 500
Washington, DC 20006-1872
(202) 828-5800

*Counsel for Petitioner
Valero Energy Corp.*

LeAnn M. Johnson
Albert Ferlo
Perkins Coie LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, DC 20005-3960
(202) 654-6209

*Counsel for Petitioners
Alon Refining Krotz Springs, Inc.,
American Refining Group, Inc.,
Calumet Specialty Products
Partners, L.P., Ergon-West
Virginia, Inc., Hunt Refining
Company, Lion Oil Company,
Placid Refining Company, U.S. Oil
& Refining Co., and Wyoming
Refining Company*

Thomas J. Perrelli
David W. DeBruin
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
(202) 639-6873

*Counsel for Petitioner
Monroe Energy, LLC*

Richard S. Moskowitz
American Fuel & Petrochemical
Manufacturers
1667 K Street, NW
Suite 700
Washington, DC 20006
(202) 552-8474

Thomas Allen Lorenzen
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2789

*Counsel for Petitioner
American Fuel & Petrochemical
Manufacturers*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties, Intervenors, and *Amici*

Petitioners:

| | |
|---|---|
| Case No. 16-1005 | Americans for Clean Energy; American Coalition for Ethanol; Biotechnology Innovation Organization; Growth Energy; National Corn Growers Association; National Sorghum Producers; and Renewable Fuels Association |
| Case No. 16-1044 | Monroe Energy, LLC |
| Case No. 16-1047 | American Fuel & Petrochemical Manufacturers |
| Case No. 16-1049 | Alon Refining Krotz Springs, Inc., American Refining Group, Inc., Calumet Specialty Products Partners, L.P., Ergon-West Virginia, Inc., Hunt Refining Company, Lion Oil Company, Placid Refining Company, U.S. Oil & Refining Co., and Wyoming Refining Company (collectively "Coalition") |
| Case No. 16-1050 | American Petroleum Institute |
| Case No. 16-1053 | National Biodiesel Board |
| Case No. 16-1054 | Valero Energy Corp. |
| Case No. 16-1056 | National Farmers Union |

7

<u>Respondents</u>:

The Environmental Protection Agency ("EPA") (in Case Nos. 16-1044, 16-1047, 16-1049, 16-1053, and 16-1054) and EPA and Gina McCarthy, Administrator (in Case Nos. 16-1005, 16-1050, and 16-1056).

<u>Intervenors</u>:

E.I. du Pont de Nemours and Company is a Petitioner-Intervenor in Case No. 16-1005.

Alon Refining Krotz Springs, Inc.; American Fuel and Petrochemical Manufacturers; American Petroleum Institute; American Refining Group, Inc.; Calumet Specialty Products Partners, L.P.; Ergon-West Virginia, Inc.; Hunt Refining Company; Lion Oil Company; Monroe Energy, LLC; Placid Refining Company; U.S. Oil & Refining Company; Valero Energy Corporation; and Wyoming Refining Company are Respondent-Intervenors in Case Nos. 16-1005, 16-1053, and 16-1056.

American Coalition for Ethanol; Americans for Clean Energy; Biotechnology Innovation Organization; E.I. du Pont de Nemours and Company; Growth Energy; National Biodiesel Board; National Corn Growers Association; National Sorghum Producers; and Renewable Fuels Association are Respondent-Intervenors in Case Nos. 16-1044, 16-1047, 16-1049, 16-1050, and 16-1054.

8

*Amici* before this Court:

None.

### B.    Rulings Under Review

The agency action under review is EPA's final action entitled Renew-able Fuel Standard Program: Standards for 2014, 2015, and 2016 and Bio-mass-Based Diesel Volume for 2017, 80 Fed. Reg. 77,420 (Dec. 14, 2015) (the "Final Rule").

### C.    Related Cases

Each of the Petitions for Review consolidated under Case No. 16-1005 is related.  These cases are *Monroe Energy, LLC v. EPA*, Case No. 16-1044; *American Fuel & Petrochemical Manufacturers v. EPA*, Case No. 16-1047; *Alon Refining Krotz Springs, Inc., et al. v. EPA*, Case No. 16-1049; *American Petroleum Institute v. Gina McCarthy, et al.*, Case No. 16-1050; *National Biodiesel Board v. EPA*, Case No. 16-1053; *Valero Energy Corporation v. EPA*, Case No. 16-1054; and *National Farmers Union v. EPA, et al.*, Case No. 16-1056.  The consolidated cases on review have not been re-viewed by this or any other Court.

On May 5, 2016, this Court deconsolidated *Alon Refining Krotz Springs, et al. v. EPA*, Case No. 16-1052, which challenges EPA's 2010 Final Rule entitled Regulation of Fuels and Fuel Additives: Changes to Renewa-

ble Fuel Standard Program, 75 Fed. Reg. 14,670 (Mar. 26, 2010) (the "2010 Rule"), from this case.  *See* Order Deconsolidating Case No. 16-1052 (Doc. No. 1611965).  No. 16-1052 is currently being held in abeyance.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and D.C.

Circuit Rule 26.1, Petitioners provide the following:

- Alon Refining Krotz Springs, Inc. is incorporated under the laws of Delaware. Alon Refining Krotz Springs, Inc. is a refiner of petroleum products. Alon Refining Krotz Springs, Inc. is owned 100% by parent company Alon USA Energy, Inc. Alon USA Energy, Inc. is a publicly traded company.

- American Fuel & Petrochemical Manufacturers ("AFPM") is a national trade association of approximately 400 companies, including virtually all U.S. refiners and petrochemical manufacturers. AFPM has no parent companies, and no publicly held company has a 10% or greater ownership interest in AFPM. AFPM is a "trade association" within the meaning of Circuit Rule 26.1. AFPM is a continuing association operating for the purpose of promoting the general commercial, professional, legislative, or other interests of its memberships.

- American Refining Group, Inc. is incorporated under the laws of Pennsylvania. American Refining Group, Inc. is a refiner of petroleum products. American Refining Group, Inc. has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

- Calumet Specialty Products Partners, L.P. is incorporated under the laws of Delaware. Calumet Specialty Products Partners, L.P. is a refiner of petroleum products. Calumet Specialty Products Partners, L.P. has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

- Ergon-West Virginia, Inc. is incorporated under the laws of Mississippi. Ergon-West Virginia, Inc. is a refiner of petroleum products. Ergon-West Virginia, Inc. is 100% owned by parent company Ergon, Inc., and no publicly held company has a 10% or greater ownership interest in it.

11

- Hunt Refining Company is incorporated under the laws of Delaware.  Hunt Refining Company is a refiner of petroleum products.  Hunt Refining Company is 100% owned by Hunt Consolidated Hydrocarbons, LLC and Hunt Consolidated, Inc., and no publicly held company has a 10% or greater ownership interest in it.

- Lion Oil Company is incorporated under the laws of Arkansas.  Lion Oil Company is a refiner of petroleum products.  Lion Oil Company is 100% owned by parent company Delek US Holdings, Inc.  Delek US Holdings, Inc. is a publicly traded company

- Monroe Energy, LLC is a Pennsylvania-based refiner of petroleum products and is wholly owned by Delta Air Lines, Inc., a publicly traded company.

- Placid Refining Company is a limited liability corporation under the laws of Delaware.  Placid Refining Company LLC is a refiner of petroleum products.  Placid Refining Company LLC has no parent company, and is owned 77% by Placid Holding Company and 23% by Rosewood Refining LLC.  None of these entities is publicly traded.

- U.S. Oil & Refining Co. is incorporated under the laws of Delaware.  U.S. Oil & Refining Co. is a refiner of petroleum products.  U.S. Oil and Refining Co. is 100% owned by parent company, TrailStone, L.P., and no publicly held company has a 10% or greater ownership interest in it.

- Valero Energy Corporation is a Texas-based energy company incorporated under Delaware law.  Valero is both the world's largest independent refiner and the nation's third-largest ethanol producer and largest renewable-diesel producer.  Valero has no parent corporation and no publicly held company owns a 10% or greater interest of its stock.

- Wyoming Refining Company is a trade name for Hermes Consolidated, LLC, a limited liability company organized under the laws of Delaware.  Wyoming Refining Company is a refiner of petroleum products.  Hermes Consolidated, LLC

is owned 100% by Par Wyoming LLC, an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly held company.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... i

CORPORATE DISCLOSURE STATEMENT ................................. v

TABLE OF AUTHORITIES .......................................................... x

GLOSSARY ............................................................................... xiii

STATEMENT WITH RESPECT TO ORAL ARGUMENT ............................ 1

JURISDICTIONAL STATEMENT ................................................. 2

STATEMENT OF THE ISSUE ...................................................... 3

STATUTES AND REGULATIONS ................................................ 4

STATEMENT OF THE CASE ....................................................... 5

    A.    The RFS Program ...................................................... 6

    B.    EPA's initial decision to place the compliance obligation only on refiners and importers ................................... 8

    C.    EPA proposed annual percentage standards for 2014-2016, inviting comments on "the full range of constraints" on the renewable-fuel supply .............................. 10

    D.    EPA refused to consider comments regarding the point of obligation but exercised its general waiver authority ................ 15

SUMMARY OF ARGUMENT ..................................................... 18

STANDING ............................................................................. 20

ARGUMENT ........................................................................... 20

A.   EPA violated its plain statutory duty to determine renewable-fuel obligations that are "applicable" to "refineries, blenders, and importers, as appropriate." ............ 20

B.   EPA's disregard of the point of obligation is premised on an unreasonable interpretation of the statute. ........................ 23

C.   EPA's refusal to consider the compliance point is arbitrary and capricious. ........................................................................ 26

  1.   Petitioners' comments were not beyond the scope of the rulemaking. ........................................................................ 27

  2.   EPA's refusal to consider the point of obligation is inconsistent with the Final Rule's rationale. ..................... 30

  3.   EPA's refusal to consider the point of obligation is inconsistent with its prior findings and conclusions. ......... 33

CONCLUSION ............................................................................... 35

CERTIFICATE OF COMPLIANCE ............................................. 38

CERTIFICATE OF SERVICE ........................................................ 39

# TABLE OF AUTHORITIES*

**Page(s)**

## CASES

*Allied-Signal, Inc. v. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) .................................................................. 35

*Amerijet Int'l, Inc. v. Pistole,*
  753 F.3d 1343 (D.C. Cir. 2014) ............................................................... 29

*Am. Petroleum Inst. v. EPA,*
  706 F.3d 474 (D.C. Cir. 2013) ......................................................... 6, 9, 33

*Chem. Mfrs. Ass'n v. EPA,*
  217 F.3d 861 (D.C. Cir. 2000) ......................................................... 25, 35

**Chevron, U.S.A., Inc. v. NRDC, Inc.,**
  467 U.S. 837 (1984) .................................................................................. 23

*City of Arlington v. FCC,*
  133 S. Ct. 1863 (2013) ............................................................................. 23

**Encino Motorcars, LLC v. Navarro,**
  136 S. Ct. 2117 (2016) ...................................................................... 28, 35

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .................................................................................. 35

*Home Box Office, Inc. v. FCC,*
  567 F.2d 9 (D.C. Cir. 1977) ..................................................................... 29

*Michigan v. EPA,*
  135 S. Ct. 2699 (2015) ...................................................................... 24, 25

*Monroe Energy, LLC v. EPA,*
  750 F.3d 909 (D.C. Cir. 2014) .................................................... 6, 7, 11, 20

**Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,**
  463 U.S. 29 (1983) .................................................................... 28, 30, 33

* Authorities upon which we chiefly rely are marked with asterisks.

16

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
630 F.3d 145 (D.C. Cir. 2010) .................................................................. 6

*New York v. EPA*,
413 F.3d 3 (D.C. Cir. 2005) ...................................................................... 22

*Pac. Nw. Newspaper Guild v. NLRB*,
877 F.2d 998 (D.C. Cir. 1989) ................................................................. 34

*Util. Air Regulatory Grp. v. EPA*,
134 S. Ct. 2427 (2014) ....................................................................... 23, 26

*White Stallion Energy Ctr., LLC v. EPA*,
No. 12-1100, 2015 WL 11051103 (D.C. Cir. Dec. 15, 2015) ...................... 35

**STATUTES**

Energy Independence and Security Act of 2007, Pub. L. No.
110-140, 121 Stat. 1492 (2007) ................................................................ 6

42 U.S.C. § 7412(n)(1)(A) ........................................................................ 25

42 U.S.C. § 7545(o)(2) ......................................................................... 6, 24

42 U.S.C. § 7545(o)(3) ........................................................... 7, 21, 24, 25, 27

42 U.S.C. § 7545(o)(7) ......................................................................... 8, 26

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 80.1406 ............................................................................. 8, 10

40 C.F.R. § 80.1427 ................................................................................ 7

**FEDERAL REGISTER**

72 Fed. Reg. 23,900 (May 1, 2007) ........................................................ 8, 9

*75 Fed. Reg. 14,670 (Mar. 26, 2010) ............................... iv, 8, 9, 10, 26, 33

75 Fed. Reg. 76,790 (Dec. 9, 2010) ......................................................... 21

78 Fed. Reg. 12,158 (Feb. 21, 2013) ........................................................ 14

78 Fed. Reg. 49,794 (Aug. 15, 2013) ....................................................... 11

*80 Fed. Reg. 33,100 (June 10, 2015) ......................................10,11,12,13,28

*80 Fed. Reg. 77,420 (Dec. 14, 2015) ..........................iii, 15, 16, 17, 18, 21, 22 26, 27, 30, 31, 32, 34, 35

**OTHER AUTHORITIES**

Christopher R. Knittel et al., *The Pass-Through of RIN Prices to Wholesale and Retail Fuels under the Renewable Fuel Standard* (June 2015), *available at* http://scholar.harvard.edu/files/stock/files/pass-through_of_rin_prices_1.pdf ................................................................13

Morgenson & Gebeloff, *Wall St. Exploits Ethanol Credits, and Prices Spike*, N.Y. Times, Sept. 15, 2013, *available at* http://www.nytimes.com/2013/09/15/business/wall-st-exploits-ethanol-credits-and-prices-spike ..............................................12

18

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| Coalition | Petitioners in Case No. 16-1049 (Alon Refining Krotz Springs, Inc., American Refining Group, Inc., Calumet Specialty Products Partners, L.P., Ergon-West Virginia, Inc., Hunt Refining Company, Lion Oil Company, Placid Refining Company, U.S. Oil & Refining Co., and Wyoming Refining Company) |
| EPA | Environmental Protection Agency |
| NPRM | Notice of Proposed Rulemaking |
| RFS Program | Renewable Fuel Standards Program |
| RIN | Renewable Identification Number |

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Petitioners request that the Court hear oral argument in this case, which involves numerous parties, complex issues, and agency decisions affecting not only the parties but also the entire Nation. Accordingly, Petitioners believe oral argument will assist this Court in resolving the issues presented.

## JURISDICTIONAL STATEMENT

Petitioners incorporate the Jurisdictional Statement from the Obligated Party Petitioners' Opening Brief on Cellulosic Biofuel and Biomass-Based Diesel.

## STATEMENT OF THE ISSUE

Whether remand is required because, contrary to congressional mandate, EPA refused to consider whether it placed obligations under the Renewable Fuel Standards Program on those parties "appropriate" to "ensure" that statutorily mandated fuel volumes "are met."

## STATUTES AND REGULATIONS

All pertinent statutes and regulations appear in the Addendum to this brief.

## STATEMENT OF THE CASE

The Clean Air Act's Renewable Fuel Standards Program ("RFS Program") requires EPA to set annual obligations for renewable-fuel use in the transportation-fuel industry.  Congress directs EPA, when doing so, to obligate the "appropriate" parties to "ensure" that statutorily-required fuel volumes "are met."  Petitioners challenge an EPA Final Rule that set annual requirements under the RFS Program, yet expressly refused to consider which parties (among refineries, importers, and blenders) it is "appropriate" to obligate.

In comments on EPA's proposed rule, Petitioners demonstrated that EPA had not obligated the appropriate parties and that misplacement of the obligation was a constraint on the renewable-fuel supply.  Rather than respond, EPA declared this issue beyond the scope of the rulemaking.  Simultaneously, however, EPA for the first time exercised authority to waive statutory renewable-fuel requirements after determining that domestic supply is inadequate.  In making that determination, EPA conceded the existence of market dysfunctions that it previously indicated would compel examination of which parties to obligate.

Petitioners contend that the Final Rule omits a statutorily-required element that Congress established as central to the RFS Program's success,

24

and must therefore be remanded for EPA to consider which parties to obligate.  As detailed below, EPA's refusal to do so is contrary to plain statutory language and undermines the RFS Program's purpose and structure.  And given the regulatory history, the Notice of Proposed Rulemaking leading to the Final Rule, and EPA's analysis in the Final Rule, EPA's refusal to consider the issue would be arbitrary and capricious even without the plain statutory language.

### A.   The RFS Program

In three prior opinions,[1] this Court detailed the history and framework of the RFS Program.  Enacted in 2005 and expanded in 2007, the Program's goals include "'greater energy independence and security,'" "'increas[ing] the production of clean renewable fuels,'" and "'protect[ing] consumers . . . .'"  *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 911 (D.C. Cir. 2014) (quoting Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (2007)).  To accomplish these purposes, Congress required that "transportation fuel sold or introduced into commerce in the United States" contain annually increasing "applicable volume[s]" of renewable fuel.  *See* 42 U.S.C. § 7545(o)(2)(A)-(B).

---

[1] *Monroe Energy, LLC v. EPA*, 750 F.3d 909 (D.C. Cir. 2014); *Am. Petroleum Inst. ("API") v. EPA*, 706 F.3d 474 (D.C. Cir. 2013); and *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145 (D.C. Cir. 2010).

EPA must determine and publish annual percentage standards, which represent the fraction of renewable fuel that must be contained, on average, in transportation fuel sold or introduced into commerce to "ensure[]" that the applicable statutory volumes and other requirements are met. *See id.* § 7545(o)(3)(B)(i). The annual percentage standards must satisfy three "[r]equired elements," including that they "shall . . . be applicable to refineries, blenders, and importers, as appropriate." *Id.* § 7545(o)(3)(B)(ii)(I).

Obligated parties demonstrate compliance with the annual standards by acquiring and retiring "Renewable Identification Numbers" ("RINs"), 40 C.F.R. § 80.1427, which represent a standardized measure of renewable fuel, *id.* §§ 80.1401, 80.1415. Obligated parties generally must demonstrate compliance with a given year's standards by the following March 31. *Id.* § 80.1451(a)(1). RINs generally become available when an obligated party obtains ownership of renewable fuel or when any party blends renewable fuel into transportation fuel. *See id.* § 80.1429. Once "separated" from renewable fuel, RINs may be traded in the market or used to satisfy compliance obligations. *See Monroe Energy*, 750 F.3d at 912-13. Obligated parties that cannot obtain sufficient RINs through their own actions (because they do not control whether and to what extent the nonrenewable fuel they produce is blended with renewable fuel) must buy RINs from other sources,

including other obligated parties holding excess RINs, unobligated blend-

ers, or other third parties who buy and sell RINs.  *See* 40 C.F.R. §§ 80.1425-

29; *see also* Regulation of Fuels and Fuel Additives: Renewable Fuel Stand-

ard Program, 72 Fed. Reg. 23,900, 23,904 (May 1, 2007).  EPA has ex-

plained that this "RIN-based trading program is [] essential [to the success]

of the RFS program."  *Id.* at 23,908.

Congress provided EPA with general waiver authority to set annual

standards below statutorily applicable volumes if, after notice and com-

ment, EPA determines that "implementation of the requirement[s] would

severely harm the economy or environment" or "there is an inadequate

domestic supply."  42 U.S.C. § 7545(o)(7)(A)(i)-(ii).

### B.    EPA's initial decision to place the compliance obligation only on refiners and importers

In its 2007 regulations, EPA initially placed the compliance obliga-

tion on refiners and importers, but not blenders.  72 Fed. Reg. at 23,937.

This choice was made to "minimize the number of regulated parties and

keep the program simple." 75 Fed. Reg. at 14,722.  Thus, while it defined

the term "obligated party" to include refiners and importers, "[a] party that

simply blends renewable fuel into gasoline or diesel fuel . . . is not an obli-

gated party."  40 C.F.R. § 80.1406(a)(1).  As EPA recognized, however, this

choice misaligned the obligation and the means of compliance.  "[T]he ac-

tions needed for compliance largely center on the production, distribution, and use of a product by parties other than refiners and importers." 72 Fed. Reg. at 23,937. Refiners and importers "do not generally produce or blend renewable fuels at their facilities." *Id.*

In its 2010 Rule, EPA acknowledged that its initial administrative-ease rationale for obligating refiners and importers, but not blenders, was "no longer valid" and that imposing the obligation on "alternative" points in the fuel-supply chain would "more evenly align a party's access to RINs with that party's [RFS Program] obligations." 75 Fed. Reg. at 14,722. Professing "continue[d] belie[f] that the market w[ould] provide opportunities for parties who are in need of RINs to acquire them from parties who have excess," *id.*, however, EPA left the compliance obligation unchanged despite the "asymmetry in incentives," *see Am. Petroleum Inst. ("API")*, 706 F.3d 474, 480 (D.C. Cir. 2013) ("EPA applies the pressure to one industry (the refiners) . . . yet it is another . . . that enjoys the requisite expertise, plant, capital and ultimate opportunity for profit. Apart from their role as captive consumers, the refiners are in no position to ensure, or even contribute to, growth in the [renewable-fuel] industry.") (citations omitted).[2] But EPA pledged to "continue to evaluate the functionality of the RIN market," and

---

[2] The Court's recognition that refiners cannot ensure compliance with the cellulosic biofuel mandate applies equally to other RFS biofuel mandates.

28

to "consider revisiting" the point of obligation—that is, EPA's decision to obligate refiners and importers, but not blenders[3]—if EPA "determine[d] that the RIN market is not operating as intended, driving up prices for obligated parties and fuel prices for consumers." 75 Fed. Reg. at 14,722.

### C.   EPA proposed annual percentage standards for 2014-2016, inviting comments on "the full range of constraints" on the renewable-fuel supply.

In its June 10, 2015, Notice of Proposed Rulemaking ("NPRM"),[4] EPA proposed to exercise its general waiver authority for the first time and to set annual renewable-fuel volumes for 2014-2016 below the statutorily applicable volumes.   According to EPA, "real-world limitations," such as slower-than-expected development of the cellulosic biofuel industry, lower-than-expected gasoline use, and biofuel-supply constraints, had rendered domestic supply inadequate, triggering the agency's authority to waive the statutory volumes. *Id.* at 33,101-102.

Although below the statutory targets, EPA's proposed volumes "require [renewable-fuel] use at levels significantly beyond the . . . E10 blend-wall." *Id.* at 33,102.  The blendwall is "an infrastructure and market-related constraint on ethanol demand" that "arises because most U.S. vehicle en-

[3] Petitioners, like EPA, refer to the effect of EPA's definition of "obligated party" in 40 C.F.R. § 80.1406 as the "point of obligation."

[4] *See* Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016, 80 Fed. Reg. 33,100 (June 10, 2015).

gines were not designed to handle gasoline consisting of more than 10 percent ethanol." *Monroe Energy*, 750 F.3d at 913-14.

EPA proposed "to overcome current constraints and challenges" and incentivize expanded renewable-fuel use. 80 Fed. Reg. at 33,102. According to EPA, "[t]he effect of increasing RIN prices is . . . to reduce the price of more renewable-fuel intensive fuels (e.g. E85) relative to the price of fuels with a lower renewable content (e.g. E10)." Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards, 78 Fed. Reg. 49,794, 49,822 (Aug. 15, 2013). This dynamic, EPA believed, would result in greater penetration of renewable fuel.[5]

The NPRM acknowledged that when determining the degree to which "domestic supply" was "inadequate," thereby permitting waiver of the statutory volumes, EPA should consider "the full range of constraints that could result in an inadequate supply of renewable fuel to the ultimate consumers, including fuel infrastructure and other constraints." 80 Fed. Reg. at 33,111. EPA invited and encouraged comments "on all aspects of this proposal" and "any aspect of this rulemaking." *Id.* at 33,150.

---

[5] Under EPA's theory, higher RIN prices "should" reduce the effective cost of ethanol, thereby reducing the cost of high-ethanol fuel blends relative to E10. *See* 80 Fed. Reg. at 33,119 & n.49 (citing A Preliminary Assessment of RIN Market Dynamics, RIN Prices and Their Effects, Dallas Burkholder, Office of Transp. and Air Quality, EPA (May 14, 2015)).

In response to the NPRM, over a dozen parties submitted comments urging EPA to amend the regulatory definition of "obligated party" to correct multiple systemic problems that result from imposing the obligation on refiners and importers, but not blenders. These comments demonstrate that the existing regulatory point of obligation is itself a supply constraint. *See* JA (Valero Comments 2-5, 40-45; Monroe Energy Comments 40-46; Coalition Comments 18-19). The administrative record supporting these comments includes reports by economic experts and an analysis by Ronald Minsk, who served as Special Assistant to the President for Energy and Environment. The record shows that the mismatch between the current compliance point and the means of compliance has hampered penetration of renewable fuels at higher levels, prevented the value of RINs from passing through to consumers in the form of relatively lower prices for high-ethanol fuel blends relative to E10, and impeded installation of infrastructure needed to blend increasing volumes of renewable fuel.

Based on his review of the data, Minsk concluded that "the RINs market is simply not functioning as it should." JA (Minsk Letter 3). Specifically, "[t]he current point of obligation is a significant factor inhibiting greater amounts of E85, and perhaps biodiesel, from reaching the market due primarily to the lack of properly aligned incentives and the resulting

shortfall in blending infrastructure expansion." *Id.* (Minsk letter 6-7).[6] Likewise, a study by National Economic Research Associates (the "NERA Report") concluded that, "if EPA wants [the RFS program] to have any chance of meeting its original goals, it must consider changes to its design." JA (Valero Comments 6 (quoting NERA Report 16)).

Additionally, economists from MIT, the University of Michigan, and Harvard released a paper demonstrating that the pass-through of RIN prices to retail customers in the form of lower E85 prices relative to E10 "is precisely estimated to be zero if one adjusts for seasonality."[7]  Thus, the primary theoretical mechanism on which EPA relied to increase the renewable-fuel supply, *see* 80 Fed. Reg. at 33,119, was not functioning as EPA had intended.  The economists concluded that

> [w]hile RIN prices might be passed through at some retail outlets at some times, this is not the case on average using national prices . . . . [T]he key economic mechanism to induce consumers to purchase high-renewables blends is the incentives provided by RIN prices.  If the RIN price savings inherent in blends with

[6] Minsk examined whether high RIN prices in early 2013 actually incentivized additional build-out of E85 infrastructure where E85 is most readily available.  "Tellingly," in "the state with most stations selling E85. . . as RIN prices rose in early 2013, the number of stations selling E-85 declined."  JA (Minsk Letter 3).

[7] JA (Monroe Energy Comments Ex. A, Christopher R. Knittel et al., *The Pass-Through of RIN Prices to Wholesale and Retail Fuels Under the Renewable Fuel Standard 2* (June 2015), http://scholar.harvard.edu/files/stock/files/pass-through_of_rin_prices_1.pdf).

high biofuels content are not passed on to the consumer, then
this key mechanism of the RFS is not functioning properly.

JA (Monroe Energy Comments Ex. A 20).

EPA also received comments that the misplaced point of obligation
has facilitated speculation, manipulation, and fraud in the RINs market,
which—despite billions of annual transactions collectively worth billions of
dollars—is essentially unregulated.[8]  *E.g.*, JA (Valero Comments 29-31).
Commenters explained that the misplaced point of obligation has created
opportunities for blenders to reap windfall profits from selling RINs, rather
than incentivizing increased renewable-fuel sales.  JA (Valero Comments
14-19; Coalition Comments 3-6).[9]  The Department of Energy likewise rec-
ognized that parties "generate revenue by blending renewable fuels and

[8] With significant understatement, EPA has called this a "buyer beware"
market for RINs.  *See, e.g.*, RIN Quality Assurance Program, 78 Fed. Reg.
12,158, 12,162 (Feb. 21, 2013).  The New York Times reported that "rules
that apply to almost every other market—on transparency, disclosure and
position limits, for example—are not imposed on the trade of RINs."  JA
(Valero Comments Attachment) (Morgenson & Gebeloff, *Wall St. Exploits
Ethanol Credits, and Prices Spike*, N.Y. Times, Sept. 15, 2013, at A1, *avail-
able  at*  http://www.nytimes.com/2013/09/15/business/wall-st-exploits-
ethanol-credits-and-prices-spike.html).  Speculators unconnected to obligat-
ed parties or renewable fuel can buy and hoard RINs, and RIN prices are
essentially "unbridled."  *Id.*  "[B]ecause the E.P.A. declines to disclose who
actively trades the credits, or how much they trade," the market cannot func-
tion like other public trading markets.  *Id.*

[9] One company, Murphy Oil, reported a $92.9 million profit from selling
RINs.  JA (Coalition Comments 5).

33

selling excess RINs" for "windfall profits," frustrating statutory objectives.[10]

Petitioners therefore identified EPA's placement of the compliance obligation as a supply constraint in 2014-2016, contributing to EPA's need for a waiver. They urged EPA to address that constraint by modifying the regulatory definition of "obligated party" to apply to blenders. JA (Valero Comments 38).

### D. EPA refused to consider comments regarding the point of obligation but exercised its general waiver authority.

In the Final Rule, EPA exercised its general waiver authority for the first time.[11]  Stating that it was exercising the waiver only "to the extent necessary," 80 Fed. Reg. at 77,426, EPA set annual renewable-fuel requirements below statutory volumes for 2014-2016, but at levels that reflect a "market forcing" policy and require surmounting long-recognized constraints such as the E10 blendwall, *id.* at 77,423.

In issuing the waiver, EPA recognized that reality had disproved its economic theory and that higher RIN prices would not necessarily drive greater renewable-fuel supply under the current Program structure. EPA

---

[10] *See* Small Refinery Exemption Study, Office of Policy and Int'l Affairs, U.S. Dep't of Energy 35 (Mar. 2011).

[11] Petitioners support EPA's exercise of the waiver and have intervened on EPA's behalf to demonstrate that the waiver was necessary and authorized. As detailed in this brief, EPA's need to waive statutory volumes highlights the illegality of EPA's refusal to consider the appropriate point of obligation.

acknowledged that for RINs to reduce the relative retail price of high-ethanol fuel blends, the "marketplace [must] work[] both efficiently and quickly." *Id.* at 77,459. Yet EPA found that the marketplace was *not* working efficiently or quickly—just as the MIT, Michigan, and Harvard economists had found. As EPA explained, "the market [since 2013] was not sufficiently responsive to higher RIN prices to drive large increases in E85 sales volumes." *Id.* It therefore candidly stated that "the RIN is currently an inefficient mechanism for reducing the price for higher level ethanol blends at retail, and therefore unlikely to be able to significantly impact the supply of ethanol in the United States in 2016." *Id.* at 77,457.

In reaching that conclusion, EPA relied on an updated RIN-market analysis by EPA economist Dallas Burkholder. *See id.* at 77,459 n.84 (citing An Assessment of the Impact of RIN Prices on the Retail Price of E85 (Nov. 2015)). Burkholder's report explained that whether the value of RINs reduces the relative retail price of high-ethanol fuel-blends is "a significant issue, as it is one of the primary ways the RFS program can incentivize the increasing use of renewable fuels." JA (Burkholder 3). The paper found that instead of reducing the relative price of E85 to reflect the value of RINs, as EPA had theorized, blenders and retailers that are not obligated under the RFS Program instead profit by retaining the value of the RINs.

35

JA (Burkholder 1, 10).

This discussion implicated Petitioners' comments that improper placement of the compliance obligation on refiners and importers, but not blenders, was itself a constraint causing dysfunction in the RIN market and inhibiting renewable-fuel supply, and that modifying the point of obligation would correct those problems. As Harvard economist James Stock noted, "blenders are better situated to pass the RIN subsidy for high-renewable content fuels along to the consumer than are the current obligated parties, who are further upstream." *See* JA (Monroe Energy Comments at 45; *id.* Ex. B 29).

EPA acknowledged that numerous commenters had suggested that EPA modify the point of obligation. 80 Fed. Reg. at 77,431. EPA did not deny that Petitioners identified real problems associated with the current point of obligation or that salutary effects would flow from Petitioners' pro-posed revision to the regulatory definition of "obligated parties." In fact, the agency acknowledged that the point of obligation "can . . . play a role in improving incentives provided by the RFS program to overcome challenges that limit the potential for increased volumes of renewable fuels." *Id.* In response to Petitioners' comments, however, EPA said only this:

> A number of commenters provided . . . suggestions that EPA . . .
> change the RFS program's point of obligation from its current

focus on producers and importers of gasoline and diesel. . . . [T]hese issues are beyond the scope of this rulemaking.

*Id.*

EPA claimed that "additional detailed responses" could be found in a separately docketed Response to Comments.  *Id.* at 77,483.  In nearly 1,000 pages, however, EPA mustered only this response to the comments and economic analyses regarding the point of obligation:

> In the proposed rule, EPA did not propose any changes to the definition of an obligated party, nor did we specifically seek comment on this issue.  EPA received comments requesting that we change the point of obligation in the RFS program primarily from parties that are obligated under the current regulations.  In response we also received comments primarily from those who did not wish to see the obligation placed on them. These comments are beyond the scope of this rulemaking. EPA's current regulations, published in March 2010, define an obligated party as any refiner that produces gasoline or diesel fuel . . . .

JA (Response to Comments 883).

## SUMMARY OF ARGUMENT

EPA's Final Rule promulgated annual renewable-fuel requirements but refused to consider whether they were applicable to the appropriate parties, as the statute requires.  *Chevron* and arbitrary-and-capricious review each requires remand for EPA to consider the point of obligation.

EPA's promulgation of the Final Rule without consideration of the appropriate parties to be obligated was contrary to plain statutory lan-

37

guage.  The statute requires EPA to set annual obligations to "ensure" that statutory requirements for renewable fuel "are met."  Congress unambiguously mandated that a "required element" of these annual determinations is that the obligations "shall . . . be applicable" to "appropriate" parties.  EPA contravened its statutory duty by refusing to address comments demonstrating that EPA failed to obligate appropriate parties and by failing to consider this issue in the Final Rule.

Even if the statute were less clear, no reasonable interpretation could support EPA's position that the question of who should be obligated was irrelevant to the underlying rulemaking.  That interpretation is inconsistent with the statute's text, purpose, and structure, as well as multiple aspects of the NPRM and the Final Rule, including EPA's exercise of general waiver authority.

Finally,  EPA's refusal to respond to Petitioners' comments on the point of obligation or otherwise consider the issue renders aspects of the Final Rule arbitrary and capricious both procedurally and substantively.  EPA's contention that the point of obligation was beyond the scope of the rulemaking cannot withstand scrutiny.  To the contrary, this issue is squarely within EPA's statutory duty, Petitioners' comments responded directly to EPA's NPRM, and accepting those comments and supporting data would

have required a change in the Final Rule.  The point of obligation is not tangential to the Final Rule, but (as EPA itself has admitted) is central to how the RFS Program functions.  For that and other reasons, EPA's refusal to consider whether the appropriate parties are obligated renders the Final Rule's rationale internally inconsistent—which makes it arbitrary and capricious.  EPA's refusal to confront the compliance obligation contrasts starkly with its findings and commitments in prior RFS Program rulemakings, and EPA has offered nothing to justify its very different approach today.

## STANDING

Petitioners incorporate the standing and standard-of-review discussions from Obligated Party Petitioners' Opening Brief on Cellulosic Biofuel and Biomass-Based Diesel (at 12-13).  As obligated parties, Petitioners have standing.  *See Monroe Energy*, 750 F.3d at 915.

## ARGUMENT

Remand is necessary because, contrary to Congress's command, EPA refused to consider whether it placed RFS Program compliance obligations on "appropriate" parties.

### A.    EPA violated its plain statutory duty to determine renewable-fuel obligations that are "applicable" to "refineries, blenders, and importers, as appropriate."

Each year, EPA must "determine and publish" the annual renewable-fuel obligation that "ensures" that the applicable statutory volumes for re-

newable fuel "are met."  42 U.S.C. § 7545(o)(3)(B)(i).  That annual determination "shall" include:

> (ii)  Required elements
>
> The renewable fuel obligation determined for a calendar year under clause (i) shall—
>
>> (I)    be applicable to refineries, blenders, and importers, as appropriate;
>>
>> (II)   be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and
>>
>> (III)  subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

*Id.* § 7545(o)(3)(B)(ii).

In the Final Rule, EPA acknowledged its duty to satisfy these required elements.  *See* 80 Fed. Reg. at 77,511; *see also* 75 Fed. Reg. at 76,791-792. In refusing to consider Petitioners' comments regarding placement of the obligation on the appropriate parties, however, EPA effectively declared the first of the "required elements" to be "beyond the scope of th[e] rulemaking." 80 Fed. Reg. at 77,431.

The statute's plain language establishes that each of the three "required elements" is mandatory.  EPA recognizes, for example, that it cannot, consistent with subparagraph (B)(ii)(III), promulgate percentage standards that do *not* consist of a "single annual standard."  80 Fed. Reg. at

77,511.  It obviously could not avoid that requirement by declaring it to be "beyond the scope of th[e] rulemaking."  Nor does anything in the statute allow EPA to disregard another required element—EPA's duty under subparagraph (B)(ii)(I) to obligate parties "as appropriate."  *See New York v. EPA*, 413 F.3d 3, 41 (D.C. Cir. 2005) (this Court "has consistently struck down administrative narrowing of clear statutory mandates") (quotation marks omitted).

EPA has elsewhere protested that changing the point of obligation yearly would be impractical.  That mischaracterizes Petitioners' argument, which is that the agency has a statutory duty to *consider* the issue, particularly on this administrative record.  EPA may not unilaterally convert what Congress made a "required element" of the annual rulemaking process into something "beyond the scope of th[e] rulemaking" simply by "not propos[ing] any changes to [it]" "[i]n the proposed rule."  JA (Response to Comments 883).[12]

Because EPA disregarded what the statute establishes as a "required element" of its duty when promulgating annual percentage standards, the

---

[12] EPA cannot argue that the point of obligation "was not at issue in [the underlying] rulemaking," *Monroe Energy*, 750 F.3d at 919, because here numerous Petitioners raised the issue in voluminous comments that were responsive to EPA's NPRM.  In *Monroe Energy*, by contrast, petitioners had not argued for a change in the regulatory definition of "obligated party," and EPA had not exercised its statutory general waiver authority.

41

Final Rule directly contravenes "the expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984). EPA's failure to obey the congressional mandate requires a remand for EPA to consider whether it remains "appropriate" to obligate refiners and importers, but not blenders. *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013) (where "the intent of Congress is clear, that is the end of the matter" (quotation marks omitted)).

### B. EPA's disregard of the point of obligation is premised on an unreasonable interpretation of the statute.

Even if the statute were silent or ambiguous regarding consideration of which parties to obligate, treating that issue as categorically irrelevant to EPA's annual duty to set percentages would be unreasonable and contrary to the Act's purposes. *See Util. Air Regulatory Grp. ("UARG") v. EPA*, 134 S. Ct. 2427, 2442 (2014) ("Even under *Chevron*'s deferential framework, agencies must operate within the bounds of reasonable interpretation." (quotation marks omitted)).

First, such an interpretation is unreasonable in light of Congress's repeated emphasis on the importance of obligating the "appropriate" parties. Congress expressly commanded EPA not once but *twice* to obligate parties "as appropriate" when promulgating RFS Program regulations. *See* 42 U.S.C. § 7545(o)(2)(A)(iii)(I), 7545(o)(3)(B)(ii)(I). Congress first provided

42

that "[i]n general" and "[r]egardless of the date of promulgation," RFS Program regulations "*shall* contain compliance provisions applicable to refineries, blenders, distributors, and importers, *as appropriate*, to ensure" that statutory volume requirements "are met." *Id.* § 7545(o)(2)(A)(iii)(I) (emphasis added). But Congress also provided that this same obligation occurs when setting *annual* percentage standards. *Id.* § 7545(o)(3)(B)(ii)(I).

Congress thus unmistakably emphasized obligating the "appropriate" parties both for RFS Program regulations generally but also with respect to the required element of the annual percentage standards. This underscores EPA's continuing duty to obligate those parties best able to "ensure" that the statutory volumes "are met." *Id.* The word "appropriate"

> is the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors. Although this term leaves agencies with flexibility, an agency may not entirely fai[l] to consider an important aspect of the problem when deciding whether regulation is appropriate.

*Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (quotation marks omitted); *see also Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 866-67 (D.C. Cir. 2000) (regulations must be consistent with Clean Air Act's purposes). EPA cannot satisfy its statutory duty when setting annual percentage standards without at least *considering* the appropriateness of the obligated parties.

The Court voiced similar concerns in *Michigan*, where it rejected

43

EPA's interpretation that cost was irrelevant to deciding whether to regulate power plants under 42 U.S.C. § 7412(n)(1)(A), which requires the agency to "regulate electric utility steam generating units . . . if . . . such regulation is appropriate and necessary."  Although EPA determined cost to be irrelevant only after extensively addressing comments arguing otherwise, the Court held that EPA's decision "strayed far beyond" legal bounds.  *Michigan*, 135 S. Ct. at 2707.  Here, EPA ignored a far plainer statutory command.[13]

Second, the fact that EPA confronted supply constraints triggering its general waiver authority in this rulemaking "should have alerted EPA that it had taken a wrong interpretive turn" in treating the appropriateness of the obligated parties as beyond the rulemaking's scope.  *UARG*, 134 S. Ct. at 2446.  Exercising its waiver authority required EPA to determine that there is an "inadequate domestic supply."  42 U.S.C. § 7545(o)(7)(A)(ii).  This in turn required consideration of the "the full range of constraints" affecting supply.  80 Fed. Reg. at 77,435.  EPA generally claimed to take into account

---

[13] Treating the point of obligation as beyond the scope of rulemakings setting annual percentage standards, moreover, creates tension with other RFS Program provisions.  For example, "[i]n determining the applicable percentage for a calendar year," EPA "shall make adjustments . . . to prevent the imposition of redundant obligations on" obligated parties.  42 U.S.C. § 7545(o)(3)(C)(i).  This requirement further illustrates the statutory structure's purposeful imposition—at multiple points—of EPA's duty to focus on obligating only appropriate parties.

44

"*the ability of the standards we set to cause a market response and result in increases in the supply of renewable fuels.*"   *Id.* at 77,449 (emphasis added).

In this context particularly, it was unreasonable for EPA to exclude from consideration how *its own* regulatory choice—obligating refiners and importers, but not blenders—affected the domestic supply it determined to be "inadequate."   EPA admits that the only justification it has ever offered for the existing obligation point "is no longer valid," 75 Fed. Reg. at 14,722, and that unobligated blenders are "choos[ing]" behavior at odds with statutory objectives, *see* 80 Fed. Reg. at 77,458-460.   Allowing EPA to disregard systemic roadblocks of its own making frustrates the statute's purposes. And because "each additional supply increment is likely to be more difficult to achieve than the previous increments," unattended-to defects will only become *more* problematic over time.   *Id.* at 77,481.

Accordingly, EPA's view—that it may disregard the consequences of its own regulatory compliance provisions when purporting to consider how its annual standards will affect supply, *id.* at 77,449—is not entitled to *Chevron* deference.

### C. EPA's refusal to consider the compliance point is arbitrary and capricious.

EPA recognized that modifying the point of obligation could "im-

prov[e] incentives provided by the RFS Program to overcome challenges that limit the potential for increased volumes of renewable fuels." *Id.* at 77,431. Yet EPA refused even to consider comments on which parties are appropriately obligated, declaring those comments "beyond the scope of this rulemaking." *Id.* EPA's conclusory refusal to consider the point of obligation renders the Final Rule arbitrary and capricious. Thus, remand is also required under this standard of review.

### 1. *Petitioners' comments were not beyond the scope of the rulemaking.*

As detailed above in Sections A and B, the plain statutory language demonstrates that Petitioners' comments regarding the point of obligation were not "beyond the scope of th[e] rulemaking" as EPA professed, 80 Fed. Reg. at 77,431, but instead involved a "required element" of EPA's determination, 42 U.S.C. § 7545(o)(3)(B)(ii).

Petitioners' comments also responded *directly* to considerations EPA identified in the NPRM. EPA sought recommendations that would allow it to increase renewable-fuel use over time while also accounting for "real-world limitations" that "have made the timeline laid out by Congress extremely difficult to achieve." 80 Fed. Reg. at 33,101. Petitioners' comments

answered that call.[14]  *See supra* pp. 12-15.

EPA's characterization of these comments as beyond the scope—and its refusal to consider and respond to them—was thus arbitrary and capricious.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (agency that "entirely failed to consider an important aspect of the problem" acts arbitrarily and capriciously).  "One of the basic procedural requirements of administrative rulemaking is that an agency must . . . examine the relevant data and articulate a satisfactory explanation for its action."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quotation marks omitted).

In *Delaware Department of Natural Resources and Environmental Control v. EPA*, for example, EPA acted arbitrarily and capriciously by characterizing as "far afield" from its statutory responsibilities comments

---

[14] Another unaddressed agency-imposed constraint on supply was EPA's failure to establish gasoline-specific and diesel-specific standards, creating a "more difficult compliance pathway."  JA (Coalition Comments 15).  Years ago, EPA acknowledged that creating a diesel-specific standard would "more readily align the RFS obligations," yet chose not to "unnecessarily complicate the program," despite comments that refiners were ill-equipped to blend fuels they do not produce.  *See* Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 74 Fed. Reg. 24,904, 24,953 (May 26, 2009).  In the present rulemaking, the Coalition identified EPA's refusal to address the disparate treatment of gasoline and diesel as an agency-imposed supply constraint.  JA (Coalition Comments 15).  EPA ignored the Coalition's comment without even labeling the issue as "outside the scope" of the rulemaking.  EPA's subsequent use of its waiver authority made it arbitrary and capricious to ignore this agency-imposed constraint.

47

warning that a proposed rule governing use of certain power generators "threaten[ed] the efficiency and reliability of the energy markets" by forcing out traditional generators. 785 F.3d 1, 14-15 (D.C. Cir. 2015). This Court held that "EPA cannot get away so easily from its obligations . . . to respond to relevant and significant comments," emphasizing EPA's duty to "respond sufficiently to enable us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Id.* at 15 (quotation marks omitted). Here, EPA offered *no* explanation for characterizing the point of obligation as beyond the scope and did not even provide the "wan responses to . . . comments" that this Court found inadequate in *Delaware*. *Id.* "[C]onclusory statements will not do; an agency's statement [explaining its action] must be one of *reasoning*." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quotation marks omitted).

EPA also was required to respond to Petitioners' comments because their proposal, "if adopted, would [have] require[d] a change in [the] agency's proposed rule." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977). For example, EPA claims to have "finaliz[ed] volume requirements based . . . on the volumes that can be supplied in 2016 as the market addresses infrastructure and other constraints." 80 Fed. Reg. at 77,423. If the misplaced point of obligation is *itself* a constraint on supply

48

that *thwarts* infrastructure development, however, then EPA's utter disregard of that constraint renders its consideration of "infrastructure . . . constraints" incomplete. *Id.* Likewise, if Petitioners' comments are correct, then the obligation point in the Final Rule not only fails to "create incentives to increase renewable fuel supplies and overcome constraints in the market" as "Congress . . . clearly . . . intended," but actually entrenches *dis*-incentives to increased renewable-fuel use. *Id.*

### 2.    *EPA's refusal to consider the point of obligation is inconsistent with the Final Rule's rationale.*

EPA's refusal to consider or respond to Petitioners' comments regarding the compliance point is arbitrary and capricious because it is inconsistent with the Final Rule's rationale and "runs counter to the evidence before the agency." *See State Farm*, 463 U.S. at 43.  For example, EPA's analysis showed that leaving blenders unobligated has delayed necessary investment in renewable-fuel infrastructure.  As EPA explained, blenders must "invest in new infrastructure to increase their capacity to blend and distribute renewable fuels" to facilitate sales growth.  80 Fed. Reg. at 77,459.  Naturally, blenders "must see sustained profit opportunities before they are *willing* to invest in new infrastructure." *Id.* (emphasis added). Seeing no such opportunities, however, blenders have *chosen* not to make the necessary investments in infrastructure, leading EPA to conclude that

"the RFS program . . . likely cannot substantially increase the available supply of renewable transportation fuels . . . to the volumes envisioned by Congress in the short term." *Id.* at 77,460. EPA's recognition of this reality underscores the arbitrariness of its refusal to consider whether blenders should be obligated under the Final Rule to incentivize behavior necessary to achieve statutory objectives.

EPA also correctly acknowledged that because "the RIN is currently an inefficient mechanism for reducing the price for higher level ethanol blends at retail," the RIN system is "unlikely to be able to significantly impact the supply of ethanol in the United States in 2016." *Id.* at 77,457. Petitioners' comments explained, however, that the regulatory definition of "obligated party" is a root cause of the RIN system's inefficiency, because it allows unobligated blenders to profit from RINs rather than passing their value through to retail customers in the form of subsidized E85 prices. *See supra* pp. 13-15. EPA could not rationally ignore these comments—with which EPA essentially agreed, *see supra* pp. 16-17—while simultaneously purporting to address the constraints impeding growth in the renewable-fuel supply.

Moreover, EPA's refusal to consider the point of obligation is inconsistent with its waiver-related discussion in the Final Rule. For example,

50

> EPA agrees that its approach to interpreting the
> term "inadequate domestic supply" should be con-
> sistent with the objectives of the statute to grow re-
> newable fuel use over time by placing appropriate
> pressure on all stakeholders to act within their
> spheres of influence to increase biofuel production
> and use of renewable fuels.

80 Fed. Reg. at 77,439.  Having flatly refused even to consider whether cur-

rent regulations obligate the appropriate parties, however, EPA could not

have considered whether its regulations "plac[e] appropriate pressure on all

stakeholders." *Id.*

Similarly, EPA concluded that the Final Rule's percentage standards

reflect "the most likely maximum volume that can be made available under

real world conditions." *Id.* at 77,449.  The corresponding need for the

waiver exemplifies why ignoring Petitioners' comments—which demon-

strated that the existing compliance point itself *impedes* increasing renew-

able-fuel use—guarantees future deficiencies, contrary to Congress's goals.

The centrality of the point of obligation to the Final Rule should have been

obvious to EPA, which declared in prior rulemakings that "alternative ap-

proaches" to the point of obligation would "more evenly align a party's ac-

cess to RINs with that party's [renewable-fuel] obligations." 75 Fed. Reg. at

14,722; *see also API*, 706 F.3d at 480 (recognizing "asymmetry of incen-

tives" inherent in the current compliance provision).

EPA's outright refusal even to consider this issue when exercising its general waiver authority was arbitrary and capricious. *See State Farm*, 463 U.S. at 48 ("[a]t the very least," agency should have addressed alternative proposal described in comments and provided *"adequate reasons"* for abandoning it) (emphasis added). EPA offered *no* explanation—much less a "reasoned explanation"—for refusing to examine the point of obligation in the Final Rule. EPA's "self-contradictory, wandering logic" "does not constitute an adequate explanation of agency action." *See Delaware*, 785 F.3d at 16 (quotation marks omitted).

### 3.   *EPA's refusal to consider the point of obligation is inconsistent with its prior findings and conclusions.*

In its 2010 Rule, EPA acknowledged that the "rationale . . . for placing the obligation on just the upstream refiners and importers is no longer valid" and admitted that "alternative approaches" would "more evenly align a party's access to RINs with that party's [RFS Program] obligations." 75 Fed. Reg. at 14,722. But after considering comments, the agency decided not to then change the point of obligation. EPA explained that it "continue[d] to believe that the market w[ould] provide opportunities for parties who are in need of RINs to acquire them from parties who have excess." *Id.* EPA assured interested stakeholders that it would "continue to evaluate the functionality of the RIN market" and pledged to "consider revisiting" the

point of obligation if EPA "determine[d] that the RIN market is not operating as intended, driving up prices for obligated parties and fuel prices for consumers." *Id.*

By 2015, EPA had made such a determination. It acknowledged that the RIN market was no longer functioning as intended. *See, e.g.*, 80 Fed. Reg. at 77,457 ("[T]he RIN is currently an inefficient mechanism for reducing the price for higher level ethanol blends at retail, and therefore unlikely to be able to significantly impact the supply of ethanol in the United States in 2016."). But to the dismay of all who relied on EPA's 2010 pledge, including Petitioners, EPA refused to consider revisiting the point of obligation and declared all comments on the issue "beyond the scope of the rulemaking."

EPA's sudden and unexplained abandonment of its earlier commitment to considering the point of obligation is arbitrary and capricious. *See Pac. Nw. Newspaper Guild v. NLRB*, 877 F.2d 998, 1003 (D.C. Cir. 1989) ("core concern" of arbitrary-and-capricious review is to prevent agency "ad hocery"). EPA responded to comments regarding the point of obligation in 2010 when the issue was less urgent because "compliance with the . . . total renewable volume requirements could be readily achieved." 80 Fed. Reg. at 77,423. Now that statutory volume targets are unattainable and the RIN

53

market clearly does not function as intended, EPA's refusal to reexamine an admittedly problematic point of obligation required *at least* the equivalent consideration and explanation. *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (when "new policy rests upon factual findings that contradict" old policy's factual basis "or when its prior policy has engendered serious reliance interests," agency must provide "a more detailed justification" for changing course than would be required "for a new policy created on a blank slate"). Because EPA "has failed to provide even that minimal level of analysis" and refused to consider a compliance point that, in its view, lacks a valid rationale, its failure to consider the point of obligation in the context of the Final Rule is arbitrary and capricious. *Encino Motorcars*, 136 S. Ct. at 2125; *see also Chem. Mfrs. Ass'n*, 217 F.3d at 867 (EPA may not "impose costly obligations on regulated entities without regard to the Clean Air Act's purpose"). Accordingly, remand is required.[15]

## CONCLUSION

EPA's explicit refusal to consider Petitioners' comments and to determine whether the requirements promulgated in the Final Rule are made

---

[15] This Court may remand for additional agency proceedings without vacating the rule during the interim. *E.g., Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *White Stallion Energy Ctr., LLC v. EPA*, No. 12-1100, 2015 WL 11051103 (D.C. Cir. Dec. 15, 2015) (per curiam).

applicable to the appropriate parties requires granting Petitioners' Petitions for Review and remanding for further consideration.

Respectfully submitted,

*/s/ Evan A. Young*
Evan A. Young
BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Austin, TX 78701
(512) 322-2506

Samara L. Kline
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201
(214) 953-6500

Shane Pennington
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
(713) 229-1340

Lisa M. Jaeger
Richard Alonso
BRACEWELL LLP
2000 K Street, NW
Suite 500
Washington, DC
20006-1872
(202) 828-5800

*Counsel for
Petitioner Valero
Energy Corp.*

LeAnn M. Johnson
Albert Ferlo
Perkins Coie LLP
700 Thirteenth Street,
N.W. Suite 600
Washington, DC 20005
(202) 654-6209

*Counsel for Petitioners
Alon Refining Krotz
Springs, Inc., American
Refining Group, Inc.,
Calumet Specialty Products Partners, L.P.,
Ergon-West Virginia,
Inc., Hunt Refining
Company, Lion Oil Company, Placid Refining
Company, U.S. Oil & Refining Co., and Wyoming
Refining Company*

Thomas J. Perrelli
David W. DeBruin
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
(202) 639-6873

*Counsel for Petitioner
Monroe Energy, LLC*

Richard S. Moskowitz
American Fuel & Petrochemical Manufacturers
1667 K Street, NW
Suite 700
Washington, DC 20006
(202) 552-8474

Thomas Allen Lorenzen
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC
20004-2595
(202) 624-2789

*Counsel for Petitioner
American Fuel &
Petrochemical
Manufacturers*

56

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's briefing order because this brief contains 6,895 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Office Word 2010 in 14-point Georgia font.

/s/ *Evan A. Young*

Evan A. Young

September 8, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2016, I caused copies of the foregoing document to be served by the Court's CM/ECF system, which will send a notice of the filing to all registered CM/ECF users.


_____/s/ _Evan A. Young_____
Evan A. Young

September 8, 2016

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 16-1005**                                    **September Term, 2016**

**EPA-80FR77420**

**Filed On: January 30, 2017** [1658140]

Americans for Clean Energy, et al.,

    Petitioners

  v.

Environmental Protection Agency and
Regina A. McCarthy, Administrator,

    Respondents

------------------------------

E.I. du Pont de Nemours and Company, et
al.,

    Intervenors

------------------------------

Consolidated with 16-1044, 16-1047,
16-1049, 16-1050, 16-1053, 16-1054,
16-1056

## O R D E R

  It is **ORDERED**, on the court's own motion, that this case be scheduled for oral argument on April 24, 2017, at 9:30 A.M. The composition of the argument panel will usually be revealed thirty days prior to the date of oral argument on the court's web site at www.cadc.uscourts.gov.

  The time and date of oral argument will not change absent further order of the Court.

  A separate order will be issued regarding the allocation of time for argument.

           **FOR THE COURT:**
           Mark J. Langer, Clerk

      BY:  /s/
         Michael C. McGrail
         Deputy Clerk

The following forms and notices are available on the Court's website:

  Memorandum to Counsel Concerning Cases Set for Oral Argument (Form 71)

RECEIVED
UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 1 2 2016

FILED
UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 1 2 2016

CLERK

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| **VALERO ENERGY CORPORATION** ) | |
| ) | |
| Petitioner, ) | Case No. **16-1055** |
| v. ) | |
| ) | |
| **UNITED STATES ENVIRONMENTAL** ) | |
| **PROTECTION AGENCY,** ) | |
| ) | |
| Respondent. ) | |

### PETITION FOR REVIEW

Pursuant to Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1),

Section 702 of the Administrative Procedure Act, 5 U.S.C. § 702, Rule 15(a) of the

Federal Rule of Appellate Procedure, and the U.S. Constitution, Valero Energy

Corporation hereby petitions this Court to review the final action of the

Administrator of the United States Environmental Protection Agency in ("EPA" or

"Agency") promulgating the final rules entitled "Regulation of Fuels and Fuel

Additives: Changes to Renewable Fuel Standard Program," published in the Federal

Register at 75 Fed. Reg. 14,670 (Mar. 26, 2010); "Regulation of Fuels and Fuel

Additives: Renewable Fuel Standard Program," published in the Federal Register at

72 Fed. Reg. 23,900 (May 1, 2007), as amended in 73 Fed. Reg. 57248 (Oct. 2, 2008),

73 Fed. Reg. 71560 (Nov. 25, 2008), and 73 Fed. Reg. 71,940 (Nov. 26, 2008); and

"Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Requirements for 2006," published in the Federal Register at 70 Fed. Reg. 77,325 (Dec. 30, 2005).

This Court has jurisdiction to hear this petition for review because this petition is based on grounds arising after the sixtieth day of the final rules appearing in the Federal Register and is filed within 60 days after such grounds arose. 42 U.S.C. § 7607(b)(1). This petition is filed within 60 days of new grounds for petitioning for review, which arose no earlier than December 14, 2015. *See* "Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017," 80 Fed. Reg. 77,420 (Dec. 14, 2015).

Valero has filed a petition for reconsideration with EPA on these rules. *See* Exhibit A, attached. That petition is currently pending before the Agency.

Respectfully submitted,

Date: <u>February 12, 2015</u>

Lisa M. Jaeger / svp

Lisa M. Jaeger
Richard Alonso
Sandra Y. Snyder
Bracewell LLP
2000 K Street, NW
Suite 500
Washington, DC 20006-1872
202.828.5800 telephone
202.857.4812 facsimile
Lisa.jaeger@bracewelllaw.com
Richard.Alonso@bracewelllaw.com
Sandra.snyder@bracewelllaw.com

-2-

61

Clara Poffenberger
Clara Poffenberger Environmental Law and
    Policy LLC
2933 Fairhill Road
Fairfax, VA  22031
703.231.5251 telephone
Clara@airandclimatelaw.com

*Counsel for Petitioner*
*Valero Energy Corporation*

## CERTIFICATE OF SERVICE

Pursuant to Rule 15(c) of the Federal Rules of Appellate Procedure, I hereby

certify that I have this day caused the foregoing "Petition for Review" and "Corporate

Disclosure Statement" to be served, by first-class mail, postage prepaid, upon the

following:

    Gina McCarthy, Administrator
    U.S. Environmental Protection Agency
    Room 3000, William Jefferson Clinton Building
    1200 Pennsylvania Ave., NW
    Washington, D.C. 20460

    John Cruden, Assistant Attorney General
    Environment & Natural Resources Division
    U.S. Department of Justice
    RFK DOJ Building, Room 2143
    950 Pennsylvania Ave., NW
    Washington, D.C. 20530

Date: February 12, 2015

                                      Lisa M. Jaeger

-4-

63

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED

FEB 12 2016

CLERK

RECEIVED

FEB 12 2016

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————————

VALERO ENERGY CORPORATION,          )
                                    )
            Petitioner,             )          Case No. **16-1055**
      v.                            )
                                    )
UNITED STATES ENVIRONMENTAL )
PROTECTION AGENCY,                  )
                                    )
            Respondent.             )
—————————————————   )

## CORPORATE DISCLOSURE STATEMENT

1.  Valero Energy Corporation ("Valero") submits the following corporate

    disclosure statement pursuant to Rule 26.1 of the Federal Rules of Appellate

    Procedure.

2.  Valero is a Texas-based energy company incorporated under the laws of

    Delaware.  Valero refines transportation fuels, owns multiple ethanol plants,

    and markets these fuels throughout the U.S.  Valero has no parent corporation

    and no publicly held company owns a 10 percent or greater interest of its stock.

64

Respectfully submitted,

Date: February 12, 2015

_Lisa M. Jaeger / ajs_

Lisa M. Jaeger
Richard Alonso
Sandra Y. Snyder
Bracewell LLP
2000 K Street, NW
Suite 500
Washington, DC 20006-1872
202.828.5800 telephone
202.857.4812 facsimile
Lisa.jaeger@bracewelllaw.com
Richard.Alonso@bracewelllaw.com
Sandra.snyder@bracewelllaw.com

Clara Poffenberger
Clara Poffenberger Environmental Law and
     Policy LLC
2933 Fairhill Road
Fairfax, VA  22031
703.231.5251 telephone
Clara@airandclimatelaw.com

*Counsel for Petitioner*
*Valero Energy Corporation*

-6-

65

# EXHIBIT A



Richard J. Walsh
Senior Vice President
and Deputy General Counsel
Litigation and Regulatory Law

February 12, 2016

RECEIPT COPY

The Honorable Gina McCarthy
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20160

RE: Petition to Reconsider and Revise the Point of Obligation in the RFS Program

Dear Administrator McCarthy:

Pursuant to Section 307(d)(7)(B) of the Clean Air Act, 42 U.S.C. § 7607(d)(7)(B), 5 U.S.C. § 553(e), and *Oljato Chapter of the Navajo Tribe v. Train,* 515 F.2d 654, 666 (D.C. Cir. 1975), Valero Energy Corporation and its subsidiaries ("Valero") hereby submit the attached petition for the U.S. Environmental Protection Agency ("EPA" or "Agency") to reconsider and revise the point of obligation in the Renewable Fuel Standard ("RFS") program. In other words, Valero requests reconsideration of who is an "obligated party" under the RFS program. *See* 75 Fed. Reg. 14,670 (Mar. 26, 2010); 72 Fed. Reg. 23,900 (May 1, 2007), *as amended* in 73 Fed. Reg. 57,248 (Oct. 2, 2008), 73 Fed. Reg. 71,560 (Nov. 25, 2008), and 73 Fed. Reg. 71,940 (Nov. 26, 2008); 70 Fed. Reg. 77,325 (Dec. 30, 2005). Valero petitions EPA to reconsider defining "obligated party" as the entity that holds title to the gasoline or diesel fuel, immediately prior to transfer from the truck loading terminal or bulk terminal to a retail outlet, wholesale purchaser-consumer or ultimate consumer, as reflected in the records maintained for federal excise tax purposes. Making this change will address supply constraints on renewable fuel in the transportation fuel market that impede the market's ability to respond to renewable fuel volume mandates.

Please contact me with any questions regarding this petition.

Sincerely,

Richard J. Walsh
Senior Vice President and
Deputy General Counsel

One Valero Way • San Antonio, Texas 78249-1616
Post Office Box 696000 • San Antonio, Texas 78269-6000 • Telephone (210) 345-2604 • Facsimile (210) 370-4685
richard.walsh@valero.com

ЕРР.
2/12/16

67

## Valero's Petition to Reconsider and Revise the
## Point of Obligation in the RFS Program

Pursuant to Section 307(d)(7)(B) of the Clean Air Act, 42 U.S.C. § 7607(d)(7)(B), 5 U.S.C. § 553(e), and *Oljato Chapter of the Navajo Tribe v. Train,* 515 F.2d 654, 666 (D.C. Cir. 1975), Valero Energy Corporation and its subsidiaries ("Valero") hereby petition the U.S. Environmental Protection Agency ("EPA" or the "Agency") to reconsider and revise the point of obligation in the Renewable Fuel Standard ("RFS") program. Specifically, Valero requests reconsideration of 40 C.F.R. § 80.1406, which defines who is an "obligated party" under the RFS program.[1] In doing so, EPA should move the point of obligation by defining "obligated party" as the entity that holds title to the gasoline or diesel fuel, immediately prior to transfer from the truck loading terminal or bulk terminal to a retail outlet, wholesale purchaser-consumer or ultimate consumer, as reflected in the records maintained for federal excise tax purposes. Making this change will address supply constraints on renewable fuel in the transportation fuel market that impede the market's ability to respond to renewable fuel volume mandates.

Valero is uniquely situated to raise issues associated with the point of obligation in the RFS program, due to its direct experience with the rules from several commercial perspectives. As a refiner, Valero is an obligated party under the RFS rules and must comply with the RFS volume mandates. Valero owns and operates 13 petroleum refineries located in the United States. With a combined throughput capacity of approximately 2.9 million barrels per day, Valero is the world's largest independent refiner. Valero is a major fuel wholesaler and a renewable fuels producer. However, only one-third of its fuel goes into Valero branded or contract wholesale markets. Valero was the first traditional petroleum refiner to enter large-scale ethanol production and now has 11 state-of-the-art plants located throughout the Midwest, including Iowa, Nebraska, South Dakota, Ohio, Indiana, Wisconsin, and Minnesota. This makes Valero the third largest ethanol producer in the United States. Valero has further diversified its renewable investments into Diamond Green Diesel, a 12,000 barrel-per-day renewable diesel plant next to the Valero St. Charles Refinery, making Valero the largest renewable diesel producer in the U.S.

Valero's interests are unique from other refiners, ethanol producers and biofuels producers. Because of its uniquely diversified position, Valero engages with and must balance the interests and concerns of different stakeholders involved in the RFS program. Valero's business interests thus reflect concerns of a broad spectrum of market participants that EPA must consider to ensure that the RFS program functions as Congress intended and to properly implement the terms of the Clean Air Act ("CAA") RFS provisions.

### I. Background and Summary of Grounds for Reconsideration

A central feature of the RFS program is to determine the appropriate entity to be obligated to meet the renewable fuel volume requirements. In the first RFS rule, EPA placed the obligation on refiners, blenders and importers of gasoline.[2] Then in the 2007 and 2010

---

[1] The rules that Valero seeks reconsideration of are: 75 Fed. Reg. 14,670 (Mar. 26, 2010); 72 Fed. Reg. 23,900 (May 1, 2007), *as amended in* 73 Fed. Reg. 57,248 (Oct. 2, 2008), 73 Fed. Reg. 71,560 (Nov. 25, 2008), and 73 Fed. Reg. 71,940 (Nov. 26, 2008); 70 Fed. Reg. 77,325 (Dec. 30, 2005) (establishing the RVO for 2006).
[2] *See* 70 Fed. Reg. 77,325 (Dec. 30, 2005) (establishing the RVO for 2006).

-1-

regulations, the EPA placed the obligation to demonstrate compliance with the RFS program on refiners and importers of gasoline or diesel fuel. In these rules, EPA considered but decided against placing the obligation on the blenders that produce the finished products that contain biofuels.[3]

Grounds warranting reconsideration of these rules, which are identified in the following paragraph and are "of central relevance to the outcome of the rule[s]," arose after the public comment periods for these rules.[4]  Because these grounds arose after these rules had been issued, Valero could not have raised them during the public comment periods for the 2006, 2007 and 2010 rules.  The CAA requires that EPA "shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed."[5]  Separately, the Administrative Procedure Act provides a right to petition for amendment of a rule.[6]

The grounds arising after EPA's prior rule took place in the final rule issued on December 14, 2015.[7]  In this rule, for the first time, EPA used its general waiver authority to waive a portion of the advanced biofuels and total renewable fuel requirements based on inadequate supply.[8]  Over the course of the RFS program, EPA has acknowledged the existence of constraints on the supply of renewable fuel.[9]  But EPA has never before waived Congress's mandated advanced biofuel and total renewable volumes.  Also for the first time, EPA concluded that under the RFS program as presently formulated, EPA will not in the near future be able to achieve Congressionally mandated volumes[10] and that the RIN market cannot serve as the instrument to ensure the renewable fuel volumes will be met.[11]  In addition, EPA acknowledged the blendwall as a constraint on supply of renewable fuels and EPA nonetheless set volumes higher than the blendwall.  These actions and regulatory conclusions demonstrate that EPA cannot now, or in the future, "ensure that the statutory volumes are met," under the existing RFS regulatory program.  These constitute new grounds warranting convening a reconsideration proceeding.

---

[3] *See* 75 Fed. Reg. 14,670 (Mar. 26, 2010); 72 Fed. Reg. 23,900 (May 1, 2007), *as amended in* 73 Fed. Reg. 57,248 (Oct. 2, 2008), 73 Fed. Reg. 71,560 (Nov. 25, 2008), and 73 Fed. Reg. 71,940 (Nov. 26, 2008).

[4] 42 U.S.C. § 7607(d)(7)(B); *see also Oljato Chapter of the Navajo Tribe v. Train,* 515 F.2d 654, 666 (D.C. Cir. 1975).

[5] 42 U.S.C. § 7607(d)(7)(B).

[6] *See* 5 U.S.C. § 553(e).

[7] *See* 80 Fed. Reg. 77,420 (Dec. 14, 2015).

[8] *See* 80 Fed. Reg. at 77,435 (discussing "inadequate domestic supply").

[9] *See, e.g.,* 78 Fed. Reg. 9,282, 9,288 (Feb.7, 2013) (discussing that cellulosic biofuel production had been "limited to small-scale research and development, pilot, and demonstration-scale facilities"); 75 Fed. Reg. 76,790, 76,795 (Dec. 9, 2010) ("No approved pathway currently exists under the RFS program for the generation of RINs for methanol. . . ."); 58 Fed. Reg. 14,670, 14,758 (Mar. 26, 2010) (acknowledging the need for additional terminal storage capacity, truck receipt facilities for biofuels and equipment to blend biofuels, as well as additional E85 retail facilities).

[10] *See, e.g.,* 80 Fed. Reg. at 77,433 ("In the longer term, sustained ambitious volume requirements are necessary to provide the certainty of a guaranteed future market that is needed by investors").

[11] *See, e.g.,* 80 Fed. Reg. at 77,459 ("Our analysis suggests that the market was not sufficiently responsive to higher RIN prices to drive large increases in E85 sales volumes. . . ."); Memorandum from Dallas Burkholder, Office of Transportation & Air Quality, U.S. EPA, An Assessment of the Impact of RIN Prices on the Retail Price of E85 at 10-11 (Nov. 2015) (the "Burkholder Memo").

EPA agrees that it has the inherent authority under the CAA to "consider the full range of constraints, including legal, fuel infrastructure and other constraints, that could result in an inadequate supply of qualifying fuels to consumers. . . ."[12] Nevertheless, EPA has steadfastly refused to relieve the one supply constraint that is fully within its control – misplacement of the point of obligation.

As detailed below, the supply constraints created by the existing point of obligation can be redressed with a simple revision to EPA's regulations. EPA should propose and finalize revisions to the definition of "obligated party" in 40 C.F.R. § 80.1406.

Valero supports the use of EPA's waiver authority for 2014, 2015 and 2016, but EPA must also take action to move the point of obligation so that supply constraints are lifted. Doing so will further the statutory goal of meeting increasing statutory volume mandates or any increasing mandates EPA sets while continuing to use the waiver authorities. Given the current difficulties in meeting the statutory volumes established in the RFS program and EPA's recent need to exercise its general waiver authority, the time to reconsider the point of obligation is now. The increased volume mandates and EPA's recognition of market constraints in the 2015 renewable volume obligation ("RVO") rule compel EPA to take action to remove the market constraint imposed by its regulations. As EPA has stated, its authority to interpret the term "inadequate supply" is broad. Therefore, it is not reasonable for EPA to unnecessarily constrain its assessment of the adequacy of supply by failing to review of the impacts of the RFS requirements on obligated parties. Rather, EPA should reconsider the term "obligated party" to verify whether moving the point of obligation might relieve ongoing inefficiencies in the program. By interpreting "inadequate supply" broadly such that it includes reviewing the point of obligation, EPA will be utilizing all means at its disposal to try to fulfill the statutory mandate in conjunction with determining the extent to which it is necessary to exercise its waiver authority.

## II. The CAA requires changing the point of obligation to relieve supply constraints

Congress adopted the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." CAA § 101(b)(1). The fuels provisions of the CAA are a significant aspect of Congress's effort to accomplish these statutory goals. *See generally* CAA § 211. Through the RFS program, Congress mandated the introduction of statutory volumes of renewable fuel into the pool of transportation fuel. CAA § 211(o)(2)(A)(i).

Congress set the initial statutory volumes at levels that were considerably lower than they are now. Unsurprisingly, the deficiencies of the current program mechanisms were not as obvious at these lower volumes. The current higher volume mandates have exacerbated the problems created by the misplaced point of obligation. Congress foresaw the need for revisions to the RFS program and thus, mandated an ongoing obligation for EPA to "conduct periodic reviews of . . . the impacts of the requirements . . . on each individual and entity" regulated under the program "[t]o allow for appropriate adjustment" of the statutory volumes.[13] This obligation

---

[12] 80 Fed. Reg. at 77,438.
[13] CAA § 211(o)(11).

-3-

is distinct from and in addition to EPA's obligation to set the renewable fuel volumes for each calendar year. For each calendar year volume, EPA must apply the volume obligation "to refineries, blenders, and importers, as appropriate."[14] Reading these two provisions in conjunction clarifies Congress's intent that EPA regularly re-evaluate the point of obligation. EPA's longstanding and repeated interpretation that refiners are the "appropriate" party impedes the accomplishment of Congress's renewable fuels mandate and thereby, the environmental and health protection goals of the CAA.

In 2015, when EPA proposed the 2014-2016 volumes, EPA stated that its "exercise of the waiver authorities should be consistent with the objectives of the statute to grow renewable fuel use over time."[15] EPA also stated that it was

> proposing to use the waiver authorities to derive applicable volumes that reflect the maximum volumes that can reasonably be expected to be produced and consumed. Thus, while the standards that we set must be achievable, we believe that they must reflect the power of the market to respond to the standards we set to drive positive change in renewable fuel production and use.[16]

EPA asserts that its regulations reflect the "power of the market to respond to standards."[17] It is not reasonable for EPA to draw this conclusion without fully considering the market effects that can derive from changing the point of obligation. Only then can EPA rationally base its waiver decision on the "power of the market."

An analysis of the market and its participants points to a logical, natural point at which compliance *would* reflect market dynamics. The current RFS imposes the obligation to assure blending on parties who do not necessarily have control over the entities who actually have the ability to blend renewable fuel. In this way, the current structure misaligns 1) where the market points to as a natural compliance point and 2) the regulatory point of obligation. This is not rational or market based. Further, by misaligning the natural point of compliance and the point of obligation, EPA dilutes the effectiveness of its regulatory mandates and puts limits on its ability to achieve the statutory goals.

Defining the "obligated party" is a central element of the RFS program, which, if not properly defined, limits the ability of the market to respond to volume mandates. The point of obligation is within EPA's control to define and EPA has a continuing obligation to analyze this definition and consider its effectiveness for achieving the statutory goals. EPA properly exercised its waiver authority to deduce the statutory volume that will not make it into the market, but EPA stopped prematurely. In exercising its authority, EPA must remove those structural obstacles that are limiting the market – not the least of which is the point of obligation. "Agencies are not free to 'adopt . . . unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness.'"[18] Here, in light of the various barriers for renewable fuels in the market, now expressly addressed by EPA's waiver of the

---

[14] CAA § 211(3)(B)(ii).

[15] 80 Fed. Reg. 33,100, 33,104 (June 10, 2015).

[16] *Id.*

[17] *Id.*

[18] *UARG v. EPA*, 134 S. Ct. 2427, 2446 (2014).

-4-

statutory volumes, EPA must reconsider the impediments created by its own regulations while further amending those volumes, as necessary.

In the 2009 proposed rule, EPA identified changes in the renewable identification number ("RINs") system that would likely require regulatory amendments.[19] "[O]bligated parties who have excess RINs are increasingly opting to retain rather than sell [RINs] to ensure they have a sufficient number for the next year's compliance."[20]

In the final RFS2, issued in 2010, EPA acknowledged that making refiners the obligated party was not working. In the final RFS2 rule published on March 26, 2010, EPA recognized that

> When the RFS1 regulations were drafted, the obligations were placed on the relatively small number of refiners and importers rather than on the relatively large number of downstream blenders and terminals in order to minimize the number of regulated parties and keep the program simple. However, with the expanded RFS2 mandates, essentially all downstream blenders and terminals are now regulated parties under RFS2 since essentially all gasoline will be blended with ethanol. Thus the rationale in RFS1 for placing the obligation on just the upstream refiners and importers is no longer valid.[21]

While acknowledging this flaw, EPA committed to reconsider the point of obligation in future rulemaking if the RIN market did not operate as intended.[22] EPA said: "We will continue to evaluate the functionality of the RIN market. Should we determine that the RIN market is not operating as intended, driving up prices for obligated parties and fuel prices for consumers, we will consider revisiting this provision in future regulatory efforts."[23] EPA also justified its lack of action by stating that "a change in the designation of obligated parties would result in a significant change in the number of obligated parties and the movement of RINs, changes that could disrupt the operation of the RFS program during the transition from RFS1 to RFS2."[24]

The transition from RFS1 to RFS2 has been completed for some time and the RIN market is not operating as intended.[25] Nearly six years later, the factors that EPA claimed would justify a change in the point of obligation are now upon us. EPA admits as much in its December 2015 rule. In particular, EPA adopted the RIN market analysis of Dallas Burkholder and relied on it to justify its use of its general waiver authority.[26] The Burkholder Memo points out the distortions in the RIN market, including the failure by the RIN holders to pass through the value of the

---

[19] *See* 74 Fed. Reg. 24,904 (May 26, 2009).

[20] 74 Fed. Reg. at 24,963.

[21] 75 Fed. Reg. 14,670, 14,722 (Mar. 26, 2010).

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] Numerous reports and studies have concluded that the RFS system is not performing as intended. *See, e.g.,* James H. Stock, Columbia University, Center on Global Energy Policy, "The Renewable Fuel Standard: A Path Forward" (Apr. 2015); NERA Economic Consulting, "Effects of Moving the Compliance Obligation under RFS2 to Suppliers of Finished Products" (July 2015) (the "NERA Report").

[26] *See, e.g.,* 80 Fed. Reg. 77,459 n.90 (citing the Burkholder Memo, *supra* n.11).

-5-

RINs.[27]  EPA further concludes that the RINs cannot be relied upon as a tool to trigger renewable fuel production in the near future.[28]  Thus, EPA's conclusion that the current RFS is incapable of achieving the statutory goals, provides new grounds for EPA to reconsider the definition of which party is "appropriate" to shoulder the compliance burden of the RFS.

Based on the performance of the system since 2010, EPA must consider revisions to the regulations to correct for the RIN market shortcomings that impede the penetration of renewable fuel into the transportation fuel market and lead to price-spikes, RIN-hoarding, and compliance through fuel exports.[29]  These shortcomings caused by the current point of obligation indicate that EPA has not regulated the "appropriate" point in the fuel system.

We can expect that increasing volume mandates will exacerbate the shortcomings of the RFS program to a degree that the structure of the rule violates the Fifth Amendment's Due Process Clause as it places the burden of compliance, without any rational basis tethered to the unquestionably legitimate aims of the statute, on parties that do not have control over the means of compliance.  EPA can avoid forcing the resolution of a serious constitutional issue by ensuring that its rule complies with the statutory mandate to regulate the appropriate entities to ensure that the renewable fuel is blended into transportation fuel.  A rule that is unconstitutional is not an "appropriate" regulation, and the "appropriate" rational regulation of entities would pose no serious constitutional problems.  Better alignment between the RFS obligation and the RIN system will improve all parties' ability to comply with the volume mandates as they increase and will reduce the program's other shortcomings including the massive current opportunities for RIN fraud and speculation.  Both RIN fraud and speculation have imposed unnecessary additional burdens on the regulated community – and both seriously undermine Congress's purpose in enacting the RFS.

### III. Obligated parties must have the ability and incentive to increase renewable fuel

A.  The current structure of the RFS program limits the growth of renewable fuels

The current structure of the RFS program hampers the growth of renewable fuels into the U.S. fuels market because the obligation is not placed at the natural compliance point.  The burden of compliance with the RFS program is currently on refiners and importers, yet "many never interact directly with renewable fuels (i.e., do not blend these products with renewable fuels)."[30]  Rather, the actual means of compliance is achieved at the rack (terminal), where renewable fuels are blended into the fuel.  The title holders of the gasoline or diesel at the blending point are the parties that determine how much of the various renewable fuels (E0, E10, E15, and E85) to produce and how to price them.[31]  This structure has created a divergence between "the party needing RINs and the party producing the RINs."[32]  As a result of this flaw, large integrated refiners are able to acquire a surplus of RINs because they own and operate their

---

[27] Burkholder Memo, *supra* n.11, at 10-11.

[28] *See* 80 Fed. Reg. at 77,482.

[29] *See* NERA Report, *supra* n.25, at 2 (explaining refiners can "escape the RFS2 system by exporting and still capture the value of the RIN").

[30] *Id.* at 1.

[31] *Id.*

[32] *Id.* at 33.

own blending facilities or, more significantly, control more fuel at the point of blending than they refine. This results in competing incentives that preclude the installation (or expansion) of blending infrastructure and the penetration of renewable fuels at higher levels. As EPA has found, the value of the RIN is not being passed through to retailers to encourage the sale of more E85.[33]

Parties that are long on RINs (after meeting their own RVO) have little incentive, and indeed may have an affirmative *dis*incentive, to expand existing blending capabilities to increase the volumes of renewable fuels or blend higher levels (E85 or E15). In fact, entities that are long on RINs have little financial incentive to blend to the blendwall – they already meet their own RVO, and if RINs are scarce, RIN prices will be higher. Thus, the current system, which exists to expand renewable fuels, irrationally encourages RIN hoarding and creates a disincentive for expanding blending capabilities.

B.  Changing the point of obligation will incentivize the growth of renewable fuels

If EPA shifts the RFS compliance obligation to the entity that holds title as defined in this petition, the incentives to blend and invest in renewable fuel infrastructure would be materially altered in a way that furthers the purpose of the RFS: all parties – regardless of whether the fuels were produced by a merchant refiner or an integrated refiner – would have an equal incentive to maximize the generation of additional RINs and thus, would maximize blending and marketing of renewable fuel. Unlike today, no party would have a surplus of RINs merely by virtue of its downstream position and all parties would be equally obligated – and, most importantly, fully incentivized to push renewable fuels into the market. As obligated parties, gasoline and diesel title holders at the blending point would see value in renewable fuels with higher RIN values (such as advanced biofuels, biodiesel or E85) and would compete in the market to blend those higher RIN value renewable fuels. If the title holders of the fuel are the obligated parties, then they control the blending choices and can ensure their compliance.

EPA offered administrative ease as a key justification for making refiners the obligated party.[34] That justification is irrational and arbitrary because it is not true. Even if conditions that existed in the past that supported that rationale, the opposite is now true: changing the point of obligation away from refiners will be easier to administer. More fundamentally, even an easily administered regulatory provision must be revised if it impedes accomplishing the goals of a statute.

EPA initially selected refiners as the point of obligation, on the basis that they were a smaller population of obligated parties to manage. Yet, the current regulations already regulate the vast majority of gasoline and diesel title holders at the point of blending because they are required to comply with the transactional, quarterly, and annual reporting requirements for all RIN-related transactions through the EPA Moderated Transaction System ("EMTS"). Analysis of terminal rack records indicates that changing the point of obligation to the title holders of

---

[33] *See* Burkholder Memo, *supra* n.11, at 10.

[34] *See* 75 Fed. Reg. at 14,722.

-7-

gasoline and diesel at the point of blending would not increase the number of obligated parties to the program and would actually make the program easier to administer.[35]

The administrative burden of moving the point of obligation to the point of blending would be inconsequential and even beneficial. First, this change would not impose any downstream impacts (i.e., below the point of blending). Thus, down-rack blenders at the retail level will be unaffected. Second, terminal owners would not be affected unless they elected to take title to the fuel above the rack. Third, refiners will remain the predominant obligated parties.[36] Furthermore, even those fuel title holders at the point of blending that are not yet obligated parties are nonetheless already experienced with entering RINs transactions in EMTS; therefore, changing the point of obligation would not be disruptive to the RFS program.[37] There simply would not be a need for extensive outreach and education to a large population of previously unregulated parties, as EPA previously posited when circumstances were fundamentally different.[38]

Even so, it is not reasonable to claim that minor administrative convenience excuses considering a modification that will far more effectively achieve the goals of the statute. The U.S. Supreme Court recognized that agencies must balance administrative burdens of rules but held that agencies cannot undermine legal mandates on the basis of administrative burdens: "An agency confronting resource constraints may change its own conduct, but it cannot change the law."[39]

As a matter of fact, EPA's concerns about the additional administrative burden are unfounded. Valero provided EPA information that changing the point of obligation would reduce the number of obligated parties in the RFS program.[40] Thus, a change to the point of obligation would decrease the administrative burden of the rule. Valero found that the number of obligated parties under the proposed point of obligation based on the entities registered would be 107.[41] EPA's own estimate of the current number of obligated parties is 200.[42] Thus, there would be a significant reduction in the number of obligated parties which reduces the number of parties that EPA must oversee for compliance. In addition, the change would ease EPA oversight of the program because the current RFS places the point of obligation at multiple points in the transportation fuel system; the recommended change reduces the locations to one

---

[35] *See* Ronald E. Minsk Comments on RFS Program Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, dated July 24, 2015, EPA Docket ID EPA-HQ-OAR-2015-0111-1307 ("By moving the obligation to the rack, refiners will still be the predominant obligated parties."); *see also* Valero Supplementary Comments on the Proposed Renewable Fuel Standards for 2014, 2015 and 2016 and Biomass-Based Diesel Volume, dated Oct. 16, 2015, EPA Docket ID EPA-HQ-OAR-2015-0111-3583, at 2-3 (concluding that revising the rule will reduce the number of obligated parties).

[36] *See* Ronald E. Minsk Comments on RFS Program Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, dated July 24, 2015, EPA Docket ID EPA-HQ-OAR-2015-0111-1307 ("By moving the obligation to the rack, refiners will still be the predominant obligated parties."); *see also* NERA Report, *supra* n.25, at 7.

[37] RINs that have been banked by obligated parties in prior years may be retained and used in 2016 without impact to the overall program, thus preserving liquidity in the market.

[38] *See* 75 Fed. Reg. at 14,722.

[39] *UARG v. EPA*, 134 S. Ct. 2427, 2446 (2014).

[40] Valero Letter to EPA Docket Center, Re: Supplement to Valero Comments on Proposed Renewable Fuel Standards for 2014, 2015 and 2016 and Biomass-based Diesel Volume (Oct. 16, 2015).

[41] *Id.*

[42] *Id.*

point in the system. Placing the point of obligation at the point of blending resolves many anomalies of the current RFS program, such as those related to transmix, butane, and small refiners.

## IV. EPA's remedy for every RIN-short refiner to acquire downstream blending capacity is irrational

EPA asserts that refiners can overcome the barriers in the RIN market by simply purchasing assets downstream.[43] This is patently irrational, lacking any record support and reflects a lack of understanding of the complexities of the fuel market. It is evident that the proper point of compliance is at the point of blending given that EPA suggests that refiners who are short on RINs should enter the blending business to achieve compliance.[44] In order to enter into the renewable fuel blending business, a company would need to acquire sufficient terminals and appropriate infrastructure, including the receipt and offloading equipment, dedicated renewable fuel storage tanks, heat traced transfer lines, and additional equipment at the rack, including injection meters and automation control systems. Aside from the considerable cost to acquire such terminals and install the requisite equipment, EPA does not recognize the market impediments to any new addition of blending facilities or the shifts in the market that would be needed to allow currently RIN-short refiners to re-position themselves as EPA suggests.

Even if RIN-short refiners still could find a way to acquire the requisite terminals and equipment and not violate anti-trust restrictions, they *still* would not be guaranteed sufficient RINs because the owner and operator of the terminal does not necessarily own the hydrocarbon that will be blended. Therefore, the refiner would need to ensure that it obtains title to the hydrocarbon and then modify its business by establishing a distribution network of parties that are interested in buying its product. Thus, a new market participant would also need to acquire renewable fuel supply contracts, which may be a costly endeavor because it may be necessary to displace existing participants. The biofuel would also need to be transported to the terminal either by pipeline or by barges. "Capacity on pipelines is already owned so this means additional cost to acquire capacity from an existing shipper."[45] To create an outlet for its renewable fuel, the new blender may need to buy out the existing contractual obligations of retailers that are already under contract with wholesalers.

In sum, it is not possible for RIN-short refiners to comply through investment in blending infrastructure without massive downstream restructuring. EPA has not evaluated the costs of the blending investment recommendation and the potential consequences on the market or on individual entities. It is unrealistic to believe that all independent refiners have sufficient resources to be able to acquire the blending facilities needed to comply with the RFS. In addition, it is impossible to purchase assets that are not for sale and to secure the market share

---

[43] *See* Memorandum from Dallas Burkholder, Office of Transportation & Air Quality, U.S. EPA, A Preliminary Assessment of RIN Market Dynamics, RIN Prices, and Their Effects at 3, 30 (May 14, 2015).

[44] *See id.* at 3 ("merchant refiners could . . . avail themselves of other compliance strategies such as . . . investing in fuel blending and distribution infrastructure. . . ."); *see also id.* at 30 ("If merchant refiners believe that owning and operating blending operations . . . would present a significant financial or strategic advantage, they may, and generally would, enter the marketplace in this capacity.").

[45] NERA Report, *supra* n.25, at 23.

necessary to ensure compliance without purchasing such assets and reversing the market trend away from integration.

EPA's suggestion that refiners should enter the blending business is further flawed because it does not take into consideration the potential antitrust issues. In its effort to ensure sufficient competition among industry participants in any industry sector to avoid price-setting and other anticompetitive behavior, the Federal Trade Commission ("FTC") monitors actions that could create a concentration in a given local or regional fuel market such that the fuel provider acquires undue control over fuel prices. The FTC has carefully scrutinized the aggregation of commercial interests in the petroleum sector. In particular, when several major refining companies engaged in mergers in the late 1990s and early 2000s, those companies were required to divest some retail markets and terminals in order to reduce their market share and dominance in certain geographic locations – exactly the opposite of what EPA proposes now.[46]

EPA's suggestion that merchant refiners (who are RIN short and who might own many refineries across the U.S.) should invest in terminals and distribution irrationally disregards antitrust concerns. Yet, implicit in EPA's suggestion that investment in blending infrastructure is the solution for these refiners is an admission by EPA that these refiners cannot comply without ownership of hydrocarbons at the rack. With this suggestion, EPA acknowledges that the very parties who are currently obligated under the RFS have no control over the object of the obligation. This is a hallmark of an irrational rule: compelling a party to comply who lacks a clear path to compliance.

Were EPA to fully analyze its unsupported assertions and conclusions about the point of obligation and the market, the record would overwhelmingly support moving the point of obligation. In particular, the analysis would underscore the unreasonableness of EPA's statutory interpretations and the arbitrariness of its conclusions. It would also demonstrate that the regulatory change discussed here offers a simple means to achieving the statutory goal – increasing renewable fuels in the market – and does not depend on a hypothetical market restructuring with no likelihood of success and obvious legal and logistical roadblocks. Where EPA has a choice between reasonable administrative changes to a rule or forcing a massive industry/market restructuring, EPA must choose the administrative change.[47]

## V. Conclusion

For the foregoing reasons, Valero respectfully requests that EPA reconsider these rules and engage in notice and comment rulemaking to modify the definition of "obligated party" in 40 C.F.R. § 80.1406 and make any additional regulatory amendments consistent with that modification. In doing so, the obligation for compliance with the RFS program should be placed on the entity that holds title to the gasoline or diesel fuel, immediately prior to transfer from the truck loading terminal or bulk terminal to a retail outlet, wholesale purchaser-consumer or ultimate consumer, as reflected in the records maintained for federal excise tax purposes. A

---

[46] *See, e.g.,* NERA Report, *supra* n.25, at 26-30 (explaining, for example, that "[s]ince 1981, the FTC has required divestitures of terminals or required other remedies related to terminaling in at least 12 transactions.").

[47] *See UARG*, 134 S. Ct. at 2444 ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism." (internal citation omitted)).

-10-

77

downstream blender that blends renewable fuel downstream of the terminal rack would not be an obligated party. This change would make the point of obligation the same as the point at which the federal excise tax is applied. EPA will thus be able to rely on the current tracking system utilized by the Internal Revenue Service to help validate yearly volume obligations.

As explained above, Valero supports EPA's use of its waiver authority for 2014, 2015, and 2016 – but EPA must now take action to move the point of obligation so that supply constraints are lifted. Valero is also pleased that EPA is committed to continuing to issue the annual RFS volumes on a timely basis in accordance with the schedule set by Congress. But for this very reason, the timing of EPA's reconsideration of the point of obligation is even more critical. Because EPA has likely begun the process of drafting the proposed 2017 RVO, we encourage quick action on this reconsideration so that this constraint on the RFS program can be resolved in advance of making a determination that there will be inadequate domestic renewable fuel supply in 2017. Waiting to address this issue will only forestall efforts to increase renewable fuel volumes.

Valero is committed to constructively working with EPA to further the goals of the RFS program. We look forward to your response.

78